

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00035-CR

DONALD WAYNE MCDOWELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 30266

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

Donald Wayne McDowell was convicted of aggravated robbery.[1]  On appeal, McDowell

claims that (1) the trial court erred in denying his motion for a directed verdict, (2) the court

erred in giving the jury a supplemental *Allen*[2] charge, (3) the evidence was insufficient to support

the jury's verdict, and (4) he must be granted a new punishment trial.  Upon our review of the

record and applicable law, we find no reversible error.  We overrule McDowell's points of error

and affirm the trial court's judgment.

## I.      Background and Trial Evidence

McDowell and Eddie Wilson[3] concocted a plan to rob someone.  According to Eddie,

McDowell selected the complainant Carlos Frias as their victim because Eddie "threw out his

name."  Frias was a handyman for an apartment complex in Paris, Texas, and Eddie lived at that

apartment complex.  Eddie apparently "threw out" Frias's name because he believed Frias and

Eddie's ex-wife, Carey Wilson, were romantically involved at the time.[4]

Eddie testified that, on January 29, 2023, the day of the robbery, he placed a video cell

phone call to McDowell, that McDowell turned his cell phone to show a man at a gas station, and

that he confirmed for McDowell that the man at the gas station was Frias, the target of their

---

[1]*See* TEX. PENAL CODE ANN. § 29.03.  McDowell pled true to two enhancement allegations and was sentenced to life imprisonment.  *See* TEX. PENAL CODE ANN. § 12.42(d).

[2]*See Allen v. United States*, 164 U.S. 492, 501 (1896).

[3]Eddie acknowledged having been charged with aggravated robbery, a first-degree felony, apparently for the robbery of Carlos Frias.  However, he pled guilty to a lesser charge of robbery and was sentenced to ten years' incarceration.

[4]Frias denied this and testified that he did not become romantically involved with Carey until after he recovered from the shooting.

robbery scheme. Frias confirmed that account. He testified, through an interpreter, that, on the day of the shooting, he stopped at a gas station where he saw "a guy in a white truck and having a -- cell phone and he moved that slowly towards [him] and in the -- the screen was a picture of Eddie." Frias knew Eddie and was friends with Carey. Frias said the man with the cell phone "was moving the phone, wanted [Frias] to look at the phone, the picture."

Later that day, Eddie met McDowell at the apartment complex and gave McDowell a pistol.[5] Eddie testified that he expected McDowell to "scare [Frias] and try to get his money from him." Eddie told the jury that, after he gave the pistol to McDowell, McDowell "put the gun in his pocket[,] . . . walked around . . . by the laundromat and . . . walked down into the apartment" complex to find Frias.

Frias testified that he left the gas station and drove to the apartment complex, where he again saw the white truck that he had seen earlier at the gas station. At the apartments, Frias went to the laundry room, where he encountered a man wearing a black mask and gloves. Frias reported that person to Linda Evans,[6] who at that time was the manager of the apartment complex. Frias then went to repair sheet rock in apartment 107. As he walked toward the apartment, Frias said the man in the black mask walked behind him, talking on his cell phone. Frias's testimony is somewhat confusing, but he claimed that, at some point, the masked man quit following him.

---

[5]Christopher Mounce, who was riding with Eddie that day, testified that he saw Eddie meet a man in a white truck and give the man a gun.

[6]Evans testified that she also saw a man in a black mask "looking around like he might have been looking for an apartment number" in the apartment complex around the time of the shooting. She saw that man go to apartment 107, where Frias was shot.

Later, Frias was patching sheet rock in apartment 107 when someone touched his baseball cap with a gun. It was the masked man. The masked man asked Frias for money. Frias told him that he had no money, and in response, the masked man said he would kill him. Frias fought the man, dislodged the attacker's mask, and saw his face. The robber shot Frias in the face. At trial, Frias identified McDowell as the robber and shooter. Evans testified that, while she did not hear a shot, she saw Frias, bleeding, emerge from apartment 107 sometime after she saw the man in black enter the same apartment.

## II.     No Error in Denying Motion for Directed Verdict

At the conclusion of the State's case, McDowell moved for a directed verdict, which the trial court denied. McDowell's first point of error complains that the trial court's denial was error. "We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence." *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

4

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part*, 544 S.W.3d 844 (Tex. Crim. App. 2018)) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'"

*Id.* at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

McDowell spends a great deal of his brief attacking the photographic lineup that was shown to Frias by Detective Brendan Middleton of the Paris Police Department. By the time of the investigation, Frias had been taken to a hospital in Plano. He had difficulty speaking.[7] On two occasions while Frias was hospitalized,[8] Middleton showed Frias a photographic lineup of six photos, one of which was a photo of McDowell. On neither of those occasions did Frias identify the robber. Yet, on February 13, two weeks after the crime, Frias went to the police station, viewed the same photographic lineup, and identified McDowell.

Carey testified that she showed Frias a photo of McDowell on Facebook. She was "not sure if it was before or after the first time when [Frias] got out of the hospital before [they saw] the detective or after, but [she was] . . . pretty sure it was after." McDowell argues that this circumstance tainted Frias's identification of him when Frias viewed the photographic lineup at the police station.

When the State offered the photographic lineup into evidence, McDowell stated that he had "[n]o objection." He filed no motion to suppress admission of the lineup. Even if the lineup

---

[7]Frias described his hospital stay as "ten days with no food, no water, [connected to] a lot of machines."

[8]From the questions asked by McDowell, it appears that Middleton showed Frias the photographic lineup "five days after" the shooting, which occurred on February 3, 2023. On February 13, 2023, Frias viewed the photographic lineup at the police station and identified McDowell. But counsel said the police station viewing/identification was the "third time" Middleton showed the lineup to Frias.

were inadmissible, our legal sufficiency review includes wrongfully admitted evidence. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper."). Because McDowell acquiesced in the admission of that evidence, he cannot now complain of its admission.

McDowell also complains that Eddie's testimony was not entitled to consideration by the jury because Eddie appeared at trial while in custody for robbery and agreed to testify at McDowell's trial.[9] McDowell argues that Eddie received a favorable plea-bargain agreement where he pled guilty to a lesser offense of robbery and received a sentence of ten years' imprisonment.[10] McDowell argues that Eddie "had obvious motive and animus toward [McDowell] to falsely identify him as being at the crime scene." The jury was free to believe or reject Eddie's testimony and determine his credibility.

The jury also heard testimony from Mounce, who was riding with Eddie that day. Mounce testified that, shortly before the robbery, he saw Eddie give a gun to someone in a white truck near the apartment complex.

Frias identified McDowell as his robber. Eddie testified that, just before the robbery, he gave his pistol to McDowell to rob or scare Frias. Mounce testified that he saw Eddie give a gun to a man in a white truck shortly before the robbery. Evans saw a man in a black mask on the apartment grounds, then saw Frias, bleeding. McDowell's appellate complaints essentially

---

[9]The record does not explicitly state, but Eddie was almost certainly an accomplice as a matter of law. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006).

[10]There is nothing in the record establishing that Eddie entered a plea agreement or what the terms of any agreement were.

7

attack the weight of some of the evidence presented to the jury. But "[t]he jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony." TEX. CODE CRIM. PROC. ANN. art. 38.04. For these reasons, we find that the evidence supported the jury's verdict, and the trial court did not err in denying McDowell's motion for a directed verdict. As a result, McDowell's first point of error is overruled.

## III. *Allen* **Charge**

Next, McDowell complains of an "*Allen* charge" given to the jury by the trial court. An *Allen* charge is a supplemental charge given to a deadlocked jury. "An *Allen* charge is usually given in response to a specific request from the jury during situations in which the jury is deadlocked." *West v. State*, 121 S.W.3d 95, 107 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Jackson v. State*, 753 S.W.2d 706, 712 (Tex. App.—San Antonio 1988, pet. ref'd)); *see Allen*, 164 U.S. at 501.

"The use of a supplemental charge in this context has long been sanctioned by both [the Texas Court of Criminal Appeals] and the United States Supreme Court." *Howard v. State*, 941 S.W.2d 102, 123 (Tex. Crim. App. 1996) (plurality op.) (op. on orig. submission), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014) (citing *Allen*, 164 U.S. 492; *Arrevalo v. State*, 489 S.W.2d 569 (Tex. Crim. App. 1973)). "The primary inquiry to determine the propriety of an *Allen* or 'dynamite' charge is its coercive effect on juror deliberation, 'in its context and under all circumstances.'" *Id.* (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam))).

Appellate courts "review a trial court's decision whether to give [an *Allen* charge] for an abuse of discretion." *Rosales v. State*, 548 S.W.3d 796, 804 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (citing *Martinez v. State*, 131 S.W.3d 22, 40 (Tex. App.—San Antonio 2003, no pet.)). An *Allen* charge is designed to "remind[] the jury that, if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve." *Mixon v. State*, 481 S.W.3d 318, 325 (Tex. App.—Amarillo 2015, pet. ref'd). "In the absence of some showing that the instruction influenced an improper verdict, error, if any, is harmless." *Jackson v. State*, 753 S.W.2d 706, 712 (Tex. App.—San Antonio 1988, pet. ref'd) (citing *Griffith v. State*, 686 S.W.2d 331 (Tex. App.—Houston [1st Dist.] 1985, order); *Golden v. State*, 232 S.W. 813 (Tex. Crim. App. 1921)).

The jury began deliberating around 9:30 a.m. on February 6, 2024. They broke for lunch for about seventy minutes. Sometime after lunch, the trial court announced that it had received a note from the jury, asking, "What happens if we cannot agree unanimously?" After reading that note to the parties, the trial court observed,

> This is about the fourth or fifth note[11] we've gotten from the jury. The other notes I've answered with the agreement of the attorneys present. . . .
>
> So I think what we're probably lurching toward -- based upon my read of the notes that have come out so far, is I think we're probably lurching toward a mistrial with a hung jury. However, that has not been represented to me and the jurors have not told me that they are hung. So I don't think a[n] Allen charge is appropriate at this time.

The trial court then instructed the jury at 1:48 p.m.:

---

[11]That jury note was number eight of the notes sent from the jury to the court.

> Ladies and gentlemen of the jury, if you cannot unanimously agree on a verdict, it will be necessary to declare a mistrial. The case will then be tried again at a later date.
>
> However, I'm not declaring a mistrial at this time and am encouraging you to continue your deliberations. By this, I mean you should continue to discuss this matter carefully, listen to each other, keep an open mind, and try to reach a conclusion on the questions asked of you.

McDowell had no objection to that response. The jury sent another note at 2:43 p.m., indicating that one juror "w[ould] not budge" and that the jury was "11-1 and they [would] not be changing their mind."[12]

Upon reading that note to the parties, the trial court said, "Considering this note and all the other notes that we've had, it appears to me that we have a deadlocked jury. This is a very hardworking jury. . . . I'm interpreting this as a deadlock."

About 3:00 p.m. that afternoon, after "five or six notes" from the jury and "off the record" discussions among the parties and the trial court, the trial court decided an *Allen* charge was necessary. McDowell objected.[13] The trial court instructed the jury as follows:[14]

> I have your note that you are deadlocked. In the interest of justice, if you could end this litigation by your verdict, you should do so.
>
> I do not mean to say that any individual juror should yield his or her own conscience and positive conviction, but I do mean that when you are in the jury room you should discuss this matter carefully, listen to each other, and try, if you can, to reach a conclusion on the questions. It is your duty as a juror to keep your

---

[12]That was the tenth note from the jury to the court.

[13]McDowell's objection was as follows: "Your Honor, the defense would object to an Allen charge. I believe it violates federal and state constitutional rights to a fair trial, due process, and due course of law."

[14]Before issuing the *Allen* charge, the court discussed with the parties the approximate amount of time that the jury had been deliberating and compared that with the amount of testimony that had been presented at trial: "So we're almost at the same amount of time in jury deliberations as we had with evidence yesterday."

mind open and free to every reasonable argument that may be presented by your fellow jurors so that this jury may arrive at a verdict that justly answers the consciences of the individuals making up this jury. You should not have any pride of opinion and should avoid hastily forming or expressing an opinion. At the same time, you should not surrender any conscientious views founded on the evidence unless convinced of your error by your fellow jurors.

*If you fail to reach a verdict, this case may have to be tried before another jury. Then all of our time would have been wasted.*[15]

Accordingly, I return you to your deliberations.

(Emphasis added). A little before 5:00 p.m. the jury indicated they had reached a verdict.

This Court reviewed the following *Allen* charge several years ago:

Members of the jury, I have your note that you are deadlocked. In the interest of justice, if you can reach a verdict, you should do so. I do not mean to say an individual juror should yield his or her own conscience and positive conviction. But I do mean that when you are in the jury room, you should discuss this matter carefully, listen to each other, and try, if you can, to reach a verdict. It is your duty as a juror to keep your mind open and free to every reasonable argument that may be presented by your fellow jurors so that this jury may arrive at a verdict that justly answers the consciences of the individuals making up this jury. You should not have any pride of opinion and should avoid hastily forming or expressing an opinion. At the same time, you should not surrender any conscientious views founded on the evidence unless convinced of your error by your fellow jurors. If you fail to reach a verdict, this case may have to be tried before another jury. Then all our time will have been wasted. Accordingly, I ask you to continue your deliberations.

*Freeman v. State*, 115 S.W.3d 183, 186 (Tex. App.—Texarkana 2003, pet. ref'd). We noted that

"[s]imilarly worded jury charges have been held not coercive in civil cases." *Id.* (citing *Stevens*

*v. Travelers Ins. Co.*, 563 S.W.2d 223, 225 (Tex. 1978); *Golden v. First Nat'l Bank in Grand*

*Prairie*, 751 S.W.2d 639, 641 (Tex. App.—Dallas 1988, no writ)).

---

[15]The italicized section is the only part of the supplemental charge quoted or discussed in McDowell's brief. We present the entire supplemental charge for the sake of context and a more balanced view of the record.

11

The instant *Allen* charge is almost identical to the charge approved in *Freeman*. We point out language common to the two:

- "I do not mean . . . [a] juror should yield his or her own conscience and positive conviction";

- "I do mean that when you are in the jury room, you should discuss this matter carefully, listen to each other, and try, if you can, to reach" a verdict or conclusion to the presented questions;

- "It is your duty as a juror to keep your mind open and free to every reasonable argument that may be presented by your fellow jurors so that this jury may arrive at a verdict that justly answers the consciences of the individuals making up this jury";

- "You should not have any pride of opinion and should avoid hastily forming or expressing an opinion";

- "At the same time, you should not surrender any conscientious views founded on the evidence unless convinced of your error by your fellow jurors"; and

- "If you fail to reach a verdict, this case may have to be tried before another jury. Then all our time will have been wasted. . . ."

As *Rosales* states,

> Approved *Allen* charges contain language reminding the jury that if they are not able to reach a verdict, the case will be tried again before another jury at some time in the future with the same evidence and same questions presented. Such charges also typically remind the jury to continue deliberations in an effort to "arrive at a verdict that is acceptable to all members of the jury if you can do so without doing violence to your conscience."

*Rosales*, 548 S.W.3d at 804 (quoting *Draper v. State*, 335 S.W.3d 412, 417 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd)).[16]

---

[16]*See also Mixon*, 481 S.W.3d at 326:

The Houston First Court of Appeals reviewed an example of an inappropriate charge:

Members of the jury, in response to your comment regarding your inability to reach a verdict, *I will instruct you to follow the oath that you took, that you and each of you solemnly swear that in the case of the State of Texas v. Lawrence Scott Griffith, you will a true verdict render according to the law and the evidence so help you God.* It would be necessary for the court to declare a mistrial if the jury found itself unable to arrive at a unanimous verdict after a reasonable length of time. The indictment will still be pending, and it's reasonable to assume the case will be tried again, the same questions to be determined by another jury and with no reason to hope such other jury would find the questions any easier to decide.

The length of time that the jury will be required to deliberate is within the discretion of the court, and the court does not at the present time feel the jury has deliberated a sufficient length of time to fully eliminate the possibility of its being able to arrive at a verdict.

---

You are instructed that in a case of this nature it is not unusual for your deliberations to take a considerable amount of time.

You are further instructed that in a large portion of the cases absolute certainty cannot be expected. Although the verdict must be based upon proof beyond a reasonable doubt, and although the verdict must be the individual verdict of each juror, and not a mere acquiescence in the conclusion of other jurors, each juror should show a proper regard to the opinion of the other jurors. You should listen, with a disposition to be convinced, to the arguments of the other jurors. You should consider whether or not you are basing your opinion on speculation or surmise and not on the evidence in this case.

If this jury finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury. The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be impaneled in the same way this jury has been impaneled and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will be the same questions confronting you, and there is no reason to expect that the next jury will find these questions any easier to decide than you have found them.

With this additional instruction, you are requested to continue your deliberations in an effort to arrive at a verdict that is acceptable to all members of the jury, if you can do so without doing violence to the conscience of any individual juror.

*Id.* The trial court's supplemental charge was "not direct[ed] . . . toward the minority jurors," *id.*, "was not coercive on its face, nor was it delivered with any additional comment that could be read to be coercive or in any way convey the trial court's view of the case," *id.* at 327. Issuance of that *Allen* charge was not error. *Id.*

13

You are to continue to deliberate in this case.

*Griffith v. State*, 686 S.W.2d 331, 331–32 (Tex. App.—Houston [1st Dist.] 1985, order). The First Court of Appeals found the italicized language, specifically its instruction for the jurors to "follow the oath that [they] took" implied "that the failure to reach a unanimous verdict either result[ed] from or constitute[d] a violation of the juror's oath." *Id.* at 333.[17]

Here, we find nothing coercive in the *Allen* charge delivered by the trial court in McDowell's trial. We also observe that the trial court considered the time the jury had deliberated and the content of their notes and requests. There being no abuse of discretion, we overrule this point of error.

## IV. The Evidence Was Sufficient to Support the Conviction

McDowell complains in his third point of error of the sufficiency of the evidence. We direct the reader to section II, *supra*, where we analyzed the evidence and found it sufficient to support the conviction. As a result, we overrule McDowell's third point of error.

## V. McDowell is Not Entitled to Reversal

Finally, McDowell claims that, "[s]hould this honorable Court reverse" his conviction, we must reverse his punishment as well. Having found no reversible error, we overrule this point of error.

---

[17]*Griffith* found the error harmless. *Griffith*, 686 S.W.2d at 333.

## VI.    Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:    January 22, 2025
Date Decided:      February 27, 2025

Do Not Publish